UNITED STATES of America ex rel. Jimmie ENOCH, Melvin Enoch, and Robert Enoch, Petitioners,

v.

Michael LANE, Director of Department of Corrections, State of Illinois, Respondent.

No. 83 C 4303.

United States District Court, N.D. Illinois, E.D.

Feb. 23, 1984.

---

James Doherty, Cook County Public Defender, Jeffrey R. Martin, Asst. Public Defender, Chicago, Ill., for petitioners.

Michael Accettura, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

In this habeas corpus case we address an issue of apparent first impression in this circuit: whether it is constitutionally permissible in a state criminal prosecution for the trial judge to refuse to permit a material defense witness to testify because the witness was not listed on the defense's pretrial witness list submitted in response to the prosecution's discovery request.

Petitioners Jimmie, Melvin, and Robert Enoch were found guilty of rape and aggravated kidnapping by a jury in the Circuit Court of Cook County, Illinois in June 1980. Jimmie and Robert were sentenced to two concurrent 25 year terms, and Melvin was sentenced to two concurrent 12 year terms. The convictions were affirmed on appeal. *People v. Enoch*, Nos. 81–2100, 81–2101, & 81–2102 (Ill.App. Mar. 31, 1982). The Illinois Supreme Court denied leave to appeal.

The main prosecution witness was the victim of the alleged crime, Sandra Davis. She testified that she went to visit her cousin, Pamela Shaviers, at 10744 South Wentworth in Chicago on the evening of December 5, 1979. She left her cousin at 4:15 a.m. on December 6 and rode a bus toward her home at 2030 South State Street. Davis testified that as she walked past 2031 South Clark Street, she saw Melvin and Robert Enoch. Robert stopped her and told her that he was "going to take [her] body." Davis pulled away, but Robert grabbed her and pushed her toward the elevator at 2031 South Clark. She testified that she saw a gun in Robert's belt. Robert put his hand on the gun and told Davis that they were going to take her upstairs and rape her. The three entered the elevator and exited at the 14th floor.

Melvin opened the door to apartment 1403 with a key, and Robert told Davis to keep quiet because his mother was asleep in the apartment. Davis was taken to a back bedroom containing two beds. Robert struck her on the side of the head with his gun and then forced her to have intercourse with him. Robert then left; Melvin entered, struck her, and forced her to have intercourse with him. Petitioner Jimmie Enoch entered as Melvin left and also forced Davis to have intercourse. Then Robert returned and again forced Davis to have intercourse with him. He told Davis that if she mentioned the incident to anyone she would be killed. Davis also testified that Melvin took photographs of the incident and threatened to "show them all around the building" if she told on them. Another Enoch, Douglas, apparently re-

mained through the entire incident on the other bed in the room. Though Davis testified that Douglas was lying down, she was unsure whether he was awake or asleep.

Davis testified that she left the Enoch residence at approximately 7:20 a.m. and went home. Later that day, she reported the rape to her mother, who called the police. Davis was taken to Mercy Hospital, where she was examined. The examining physician testified at trial that Davis had been beaten· and that her vagina contained a large quantity of semen. Both the physician and Davis' mother testified without objection that Davis told them she had been raped.

The first defense witness was a police investigator. The defense elicited from the investigator that he spoke with Davis at the hospital and that Davis told him that she had been raped by three men in apartment 1403 at 2031 South Clark and that she saw "a mother and a sister asleep" in the apartment. It is unclear why the defense introduced this testimony.

Petitioners' mother, Willie Enoch, testified that Melvin and Jimmie left the family's apartment (the same apartment 1403 referred to by Davis) between 8:00 and 9:00 p.m. on December 5. Her daughter and another woman, Joyce Darnell, left shortly thereafter, leaving Mrs. Enoch and her son Douglas, and a baby. Mrs. Enoch watched television in her bedroom "all night ... until the all night show came on." She let Jimmie and Melvin into the apartment around 4:00 or 4:30 a.m. on December 6. The prosecution, which elicited the latter testimony, did not ask Mrs. Enoch whether anyone was with her sons when they entered. Mrs. Enoch testified that she did not hear any commotion or noises in the apartment, though she stated that she probably was asleep by 5:00 a.m.

After Mrs. Enoch testified, and after a luncheon recess, petitioners' lawyers moved to amend their answer to the state's discovery request. One of the lawyers stated that he had learned some additional information from the Enoch family concerning an additional witness. He identified the witness as Patricia Griffin and stated that she would testify concerning an altercation she had observed between Ms. Davis and a man on the morning of the alleged rape. The prosecution objected to the belated disclosure. The court deferred consideration of this question until petitioners' lawyers could obtain more detailed information concerning the proposed witness' testimony.

After another recess, petitioners' lawyer identified the witness as Patricia Griffin, a resident of apartment 1402 at 2031 South Clark. Petitioners' lawyer made the following offer of proof, based on statements made to him by Griffin. On December 6, Griffin left her apartment at 7:00 a.m. On her way to the bus stop, she saw Sandra Davis, whom she had known since she was a young girl. Davis was arguing with a man, who was stating loudly something to the effect of "bitch, where is the money." [1]

Petitioners' attorney stated that he had become aware of Griffin only that day. Griffin had spoken with Mrs. Enoch some time ago, but Mrs. Enoch had not informed her sons' lawyer despite being in contact with him. The lawyer stated that Ms. Griffin was available if the prosecution wished to speak with her. The prosecutor responded that in light of Mrs. Enoch's knowledge of Griffin and the fact that Griffin lived next door to the Enochs,[2] the defense should not be permitted to add her to its witness list. The prosecution did not identify any prejudice to it as a result of the late disclosure. Essentially, its argument was based solely on the defense's lack of diligence.

The trial judge stated that discovery rules were, after all, rules, and noted that they were in the middle of a jury trial. He stated that it was "more than a question of

---

**1.** The defense attorney later noted that at or about the time of the assault, Ms. Griffin was in a bedroom adjoining the bedroom where the alleged rape took place.

**2.** The prosecutor also noted that the Enochs had been demanding for two months to go to trial.

prejudice ... It is a question of possible design, possibly I say, after the state has rested and the defense has commenced." He therefore denied the motion to amend the witness list, effectively precluding the defense from calling Ms. Griffin.

The defense's next witness was Charles Enoch, also a resident of 2031 South Clark, apartment 1403. He stated that around 7:00 p.m. on December 5, he rode the building elevator with Robert. When the elevator stopped on the 18th floor, he saw Teresa Mosley, Sandra Davis, and Michael Mayberry standing in the elevator room. He identified Davis as a resident of 2030 South State Street. Later that evening, Charles and Robert went to apartment 1906 at 2031 South Clark. Present were Sharon Edwards, who lived in apartment 1906, Teresa Mosley, Michael Mayberry, and Sandra Davis. They smoked some marijuana, took some pills (which were not identified at trial), and drank some cough syrup. Mosley left around 3:00 a.m. on December 6. Those remaining were later joined by Jimmie, Melvin, and Peggy Enoch and Joyce Darnell. Sandra Davis, Robert Enoch, and Michael Mayberry left the apartment around 6:00 a.m. They did not leave together but rather left in close succession. The prosecutor impeached Charles' testimony by eliciting on cross examination that Charles had never reported his version of the events of December 5 and 6 to the police. He also suggested that Charles had concocted the story with his brothers, Joyce Darnell, Teresa Mosley and Michael Mayberry.

Teresa Mosley, also a resident of 2031 South Clark, was the next defense witness. She testified that she had known Sandra Davis for five or six years. She stated that "[w]e use [sic] to disco together, and we use [sic] to have sex with mens [sic] for money." Mosley testified to a series of events similar to that testified to by Charles Enoch. On cross examination, Mosely first denied visiting any of the de-

fendants in jail but later admitted going to the jail to visit Robert Enoch approximately three weeks before the trial. She denied, however, actually seeing Robert at the jail. The prosecution also impeached Mosley by eliciting that she had never reported her version of the events to the police despite knowing that the Enochs were in jail awaiting trial for rape.[3]

Joyce Darnell was the next defense witness. She married Jimmie Enoch sometime after December 6, 1979. Darnell corroborated the previous defense witnesses' version of the events of December 5 and 6. On cross examination the prosecution attempted to impeach her in the same manner as it had the other defense witnesses. Sherri Edwards, the final defense witness, also confirmed the defense version of the events. After Edwards testified, one of the defense lawyers noted for the record that Patricia Griffin was present in court and asked if he could make a formal offer of proof. The judge declined to permit this, stating that he had already ruled on that matter.

The prosecution called one rebuttal witness, Davis' cousin Pam Shaviers. Shaviers testified that Sandra Davis came to her house alone around 8:00 p.m. on December 5 and remained until 4:15 a.m. on December 6. Shaviers walked Davis to the bus stop and watched her board a bus.

The defense's theory appears to have been twofold: first, that the Enochs did not have intercourse with Davis, that the evidence revealed in the hospital examination was due to her alleged "profession," and that any physical abuse was done by someone else. Alternatively, if the Enochs had intercourse with Davis, it was not done by force or against Davis' will. The prosecution argued that Davis was a credible witness and that the defense testimony was fabricated.

---

3. Mosley also testified that some six weeks before trial Joyce Darnell, who was then married to Jimmie Enoch, was involved in an altercation with Sandra Davis at the Criminal Courts building. She stated on cross examination that Davis started the fight.

Respondent has completely misapprehended the nature of this case.[4] It characterizes the petition as a challenge to an "evidentiary ruling" and argues that the evidence was "cumulative, and speculative at best." Though we construe the latter argument as a claim of harmless error, respondent has not addressed the constitutional issue raised by the petition. Further, its argument on the merits in its memorandum takes up all of one page. This, despite the fact that the habeas petition clearly characterized the claim as one of denial of petitioners' fourteenth amendment right to present a defense at trial and cited two important Supreme Court cases on that issue, *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), and *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers*, 410 U.S. at 302, 93 S.Ct. at 1049. "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defendant against the State's accusations. The right[ ] ... to call witnesses in one's own behalf [has] long been recognized as essential to due process." *Id.* at 294, 93 S.Ct. at 1045. In the present case the state trial court precluded the defense from calling a witness as a discovery sanction. In the circumstances of this case, the trial court's action violated petitioners' constitutional right to present a defense.

The colloquy that took place when the defense moved to amend its witness list demonstrates that the trial court acted with the aim of sanctioning the defense's noncompliance with discovery. The defense lawyer, after describing Griffin's expected testimony, stated that he had learned of the witness from petitioners' mother, who had told him about Ms. Griffin only that day. R. 228. He also stated that Griffin was available if the prosecution wished to

interview her. *Id.* The prosecution's argument that the motion to amend should be denied was based solely on the fact that the witness was known to Mrs. Enoch prior to trial, that she was the Enochs' next door neighbor, and that defendants had been demanding to go to trial for two months. R. 229. The trial judge then stated:

> [I]f there are to be discovery rules, they are to be viewed as rules, and whereas this Court interprets them liberally, as is suggested, they still are rules.... Here are defendants who had demanded trial before this Court, which they had every right to do, and which the Court encourages, especially when people are in custody, and because they did we held their case on the trial call every day for over two months, for about ten weeks.... We are in the third day of trial, including the jury selection, and it is now revealed to the Court that a woman in the apartment next to the apartment of the defendants spoke allegedly to the mother months ago....

\*   \*   \*   \*   \*   \*

> [N]ow it is suddenly revealed on the third day of the trial, when the State has rested and the defense has commenced. It would violate every contention of any notice of discovery to permit it.

R. 230–31. The defense then argued that the State had not shown any prejudice due to the late disclosure. R. 231. The court responded: "It is more than a question of prejudice. It is more than a question of how one side or the other is going to be hurt. It is a question of possible design, possibly I say, after the State has rested and the defense has commenced." *Id.* The court went on to state that

> situations like this are froth [sic] with possibilities. I imagine that this very situation is one of the strongest reasons why discovery rules were eventually adopted whereas it was not too long ago

---

4. Respondent filed a motion for summary judgment with a supporting memorandum. Petitioners filed a responsive memorandum combined with a cross motion for summary judgment. Respondent's next filing was a one page document stating that respondent stood on his earlier memorandum. Petitioner's counsel orally waived the filing of a further brief in a telephone conversation with our law clerk Matthew Kennelly.

there were no discovery rules beyond a list of witnesses.

These rules have been adopted, and they are good rules, and they should be adhered to and interpreted liberally. If it were the day before trial or the day of the trial, the morning of the trial, it would be late, but it would be a different factual situation, but these things are hardly tolerable.

R. 232.

■ An examination of the trial judge's statements indicates three possible reasons for the denial of the motion to amend the witness list. First and foremost, the judge was of the view that "rules are rules." Second, he speculated that the nondisclosure was "a question of possible design." Finally, he noted twice that the disclosure came during the trial, which suggests that he was concerned with delaying or interrupting the trial.

Even if the court's suggestion that the late disclosure was purposeful was a finding of fact entitled to a presumption of correctness under 28 U.S.C. § 2254(d) (1976) and *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), several exceptions to the presumption apply here. First, the material facts underlying the finding were not adequately developed by the trial court. 28 U.S.C. § 2254(d)(3). Second, petitioners did not receive a "full, fair, and adequate hearing" on the issue of purposefulness, *id.* § 2254(d)(6). Finally, and most important, the finding is "not fairly supported by the record," *id.* § 2254(d)(8). The only evidence in the record concerning the reason for the late disclosure is that petitioners' mother, the only person identified as knowing of Griffin's potential testimony, did not tell petitioners' lawyers about Ms. Griffin until tri-

al had started. There was no basis for attributing to petitioners any willful intent, for there is nothing indicating that they were aware that Ms. Griffin knew of facts favorable to them.

Though as a trial judge we sympathize with the state court judge's concern with delaying the trial of a case that has already begun, there is nothing in the record that shows that a continuance would have been necessary here. The state was represented by two lawyers throughout the trial; one of those lawyers could have interviewed Ms. Griffin while the testimony continued. The defense presented four additional witnesses after the colloquy concerning Griffin. Moreover, the trial did not end that same day; had the court inquired of petitioners' lawyer as to the amount of defense testimony he expected to present, it may well have been able to determine that trial would continue through the following day, which would have provided the prosecution with even more time to interview Griffin.[5] Finally, as we have noted, the prosecution did not argue that it would be prejudiced by the belated adding of Griffin to the defense list of witnesses. Any conclusion that delay would have resulted had the trial court granted the defense motion is not supported by the record.[6]

This leaves us with the "rules are rules" rationale as the only basis supported by the record for the trial court's action. We do not think that this reason is a constitutionally adequate one for precluding a criminal defendant from offering relevant and material testimony.

The Supreme Court has expressly left open the question whether it is proper under the sixth amendment (as incorporated by the fourteenth amendment) to enforce discovery rules against a noncomplying

5. The fact that this might not have provided the prosecution with time to develop rebuttal to Griffin's expected testimony does not in the circumstances of this case make much of a difference. It appears that none of petitioners' witnesses who testified as to the events of December 5 and 6 spoke with the prosecution or the police. The prosecution was nonetheless able to impeach their testimony effectively, as indicated

by the fact that the jury rejected the defense theory and accepted Davis' testimony.

6. Further, we again note that respondent does not contend that the trial court's action is justified by reason of any delay that would have been occasioned by granting petitioners' motion or by reason of any intentional nondisclosure by petitioners or their lawyers.

criminal defendant by excluding relevant and probative evidence. In *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) and *Wardius v. Oregon*, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), the Court held that state rules requiring a defendant to give prior notice of his intention to rely upon an alibi defense and of his alibi witnesses comport with due process only if the defendant receives reciprocal discovery rights. In *Williams*, however, the defendant complied with the notice of alibi rule, and in *Wardius*, the Court held that the absence of reciprocal discovery made enforcement of the rule invalid, so the Court was not required to reach the question whether a reciprocal discovery statute could constitutionally be enforced against a defendant. *Williams*, 399 U.S. at 83 n. 14, 90 S.Ct. at 1897 n. 14; *Wardius*, 412 U.S. at 472 n. 4, 93 S.Ct. at 2211 n. 4.

Nor has the Seventh Circuit addressed the question presented in this case or the analogous issue in the notice of alibi context. In *Alicea v. Gagnon*, 675 F.2d 913 (7th Cir.1982), the court held that it was unconstitutional to prevent a defendant from testifying on his own behalf as a sanction for noncompliance with a state notice of alibi rule. It expressly left open the question whether the same rule would apply to witnesses other than the defendant, noting that that very issue was presented in another case then pending before the court. *Id.* at 917 n. 6. However, when the other case, *United States ex rel. Veal v. DeRobertis*, 693 F.2d 642 (7th Cir. 1982), was decided, the basis for the decision was somewhat different than anticipated. The court held that the alibi notice rule applied to the petitioner was of the non-reciprocal sort forbidden by *Wardius. Id.* at 647. Moreover, it remanded the case to the trial court, because there was doubt as to whether petitioner has preserved the sixth amendment issue in the state courts. Thus, the Seventh Circuit has not spoken on the issue presented here. Further, we

have found no decisions by other judges in this district that are on point.

Several courts have held that discovery rules like or akin to that involved here cannot be enforced against a noncomplying defendant by precluding testimony. The most recent of these cases is *Fendler v. Goldsmith*, 717 F.2d 1552 (9th Cir.1983). In *Fendler*, the trial court refused to permit the petitioner to call two defense witnesses because he had not listed their addresses on his pretrial witness list, as required by state discovery rules. The court noted that it was unclear whether the sixth amendment strictly prohibited witness preclusion as a discovery sanction or rather required an examination of all the attendant circumstances. *Id.* at 1555–57. However, applying the balancing test, the court held that the trial court had committed constitutional error. One of the witnesses was petitioner's key witness on a significant issue in the case. Further, the prosecution would not have been prejudiced or surprised by the witness' testimony since it already had his name and lacked only his address and since a brief continuance would have accommodated any need for time to prepare for cross examination or rebuttal. *Id.* at 1558–59. Even assuming that petitioner's noncompliance was willful, the court stated, the preclusion of the witness was "too high a price to exact for failure to comply with discovery orders issued pursuant to general discovery rules." *Id.* at 1560.

In *United States v. Davis*, 639 F.2d 239 (5th Cir.1981), the Fifth Circuit held that it was improper to exclude otherwise admissible evidence solely as a discovery sanction.[7] In *Davis*, a case involving an alleged conspiracy to possess and distribute marijuana, the prosecution relied heavily on the testimony of a confidential informant who was involved in the alleged conspiracy. The trial court refused to permit the defendants to impeach the informant's credibility by means of reputation testimony by two other witnesses, since the witnesses

---

**7.** *Davis* was a federal prosecution. The discovery rules in question were Fed.R.Crim.P. 16

and a pretrial discovery order entered by the trial court.

were not on defendants' pretrial witness list.[8] The court of appeals reversed, stating that while witness preclusion might be a proper sanction where justified by overriding policy considerations, preclusion solely as a discovery sanction was improper. *Id.* at 243.

The court in *Hackett v. Mulcahy,* 493 F.Supp. 1329 (D.N.J.1980) held that it was unconstitutional to preclude the testimony of a defense witness because of counsel's failure to comply with discovery rules, unless the record revealed some complicity by the defendant. *Id.* at 1336. Finally, in *Ronson v. Commissioner of Correction,* 604 F.2d 176 (2d Cir.1979), the court examined a state court's refusal to permit a defendant to call a psychiatrist to testify in support of an insanity defense, because the defendant had not given notice of his intention to raise that defense, as required by state law. *Ronson* differs from the present case in that the defendant had substantially complied with the notice requirement by sending a letter to the prosecution "reserving [his] right" to interpose such a defense. However, the case is significant in that the court applied a "less restrictive alternative" analysis, noting that a continuance would have minimized any possible surprise or prejudice to the prosecution. *See also Fendler,* 717 F.2d at 1557 (noting that alternate means exist to make discovery rules effective, including continuances, permitting prosecutorial comment on the defendant's noncompliance, and contempt); Note, "The Preclusion Sanction—A Violation of the Constitutional Right to Present a Defense," 81 Yale L.J. 1342, 1356–60, 1364 (1972); Reznick, "The New Federal Rules of Criminal Procedure," 54 Geo.L.J. 1276, 1294 (1966).

The Supreme Court's opinion in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct.

3090, 41 L.Ed.2d 1039 (1974), informs our analysis here:

> We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system depends on full disclosure of all the facts, within the framework of the rules of evidence.

*Id.* at 709, 94 S.Ct. at 3108. Except in a case where preclusion is imposed for reasons related to the integrity or probative value of the evidence, it necessarily detracts from the "search for the truth," which is, as the Supreme Court has stated, a central goal of the criminal justice system. *United States v. Nobles,* 422 U.S. 225, 232, 95 S.Ct. 2160, 2167, 45 L.Ed.2d 141 (1975); *Williams v. Florida,* 399 U.S. 78, 82, 90 S.Ct. 1893, 1896, 26 L.Ed.2d 446 (1970). In the present case there is no suggestion that the trial court acted out of a perceived need to bar evidence with no probative value or that was somehow tainted.[9]

Thus, this case is not like *United States v. Nobles.* In that case, the Court upheld a trial court's ruling barring an investigator from testifying for the defense concerning a government witness' prior statements if the defense did not produce the investigator's written report for use by the government in cross examination. The Court specifically noted that the district court "did not bar the investigator's testimony" but rather "merely prevented [defendant] from presenting to the jury a partial view of the credibility issue ...." *Id.* 422 U.S. at 241, 95 S.Ct. at 2171. The Court stated that the

---

8. The trial court alternatively ruled that the testimony would be merely cumulative. The court of appeals disagreed with this conclusion as well, 639 F.2d at 243–45.

9. Though the prosecution undoubtedly would have argued that Griffins' testimony was "con-

cocted" had it been admitted, as it argued with respect to the other defense witnesses, the state court made no such determination in denying the motion to amend the witness list, nor was there any basis for it to make such a determination.

sixth amendment "does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as justification for presenting what might have been a half-truth." *Id.* In the present case, there is no basis for concluding that Griffin's testimony would have been a "half-truth" in the sense of *Nobles;* though one might argue that Griffin's potential testimony was, as the prosecution argued with respect to the other defense witnesses, "concocted," the trial court could not make such a determination on the basis of the record before it. *Nobles* may permit a trial court to bar testimony where the defense obstructs any meaningful cross examination; it does not permit a trial court to bar testimony absent a showing of such prejudice to the state.

Nor is this case like those where the integrity of the evidence is questionable. Courts have held that where a defense witness has violated a sequestration order, her testimony may be precluded if it was tainted by the lack of sequestration. *See Holder v. United States,* 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893); *Fendler,* 717 F.2d at 1556.

Like the court in *Fendler,* we see no need in the present case to decide whether the sixth amendment requires a prohibition of witness preclusion as a discovery sanction, for even under a balancing test we think that the trial court committed constitutional error. While we recognize that there is a body of opinion supporting the view that witness preclusion may sometimes be the only way to enforce valid discovery rules, *see Fendler,* 717 F.2d at 1557 (citing several state court cases), in the circumstances of this case the sanction was too stiff a penalty. First, there is no evidence that petitioners were in any way responsible for the failure to list Griffin as a witness. The failure appears to be attributable to petitioners' mother or, perhaps, to the lack of diligence of petitioners' lawyer.

As the court noted in *Fendler,* penalizing a criminal defendant for his lawyer's negligence only creates additional constitutional problems and invites attacks on convictions based on the incompetence of counsel.

Second, Griffin's testimony was very important to the defense. The evidence against petitioners consisted primarily of the testimony of the victim, Sandra Davis. Her story was credited by her mother and the examining physician, both of whom stated that Davis had told them that she had been raped. The prosecution's case, then, depended almost entirely on the credibility of Davis when she claimed that petitioners had raped her and inflicted the blows that caused her to be bruised. Petitioners' defense was, as we have noted, two-fold; the first line of defense was that Davis' condition resulted from her alleged "profession" as a prostitute, and that no rape occurred. Griffin's testimony would have buttressed petitioners' contention that Davis was a prostitute by providing evidence corroborating Teresa Mosley's testimony. We disagree with the state appellate court's conclusion, *see People v. Enoch,* slip op. at 3–4, that Griffin's testimony would have been cumulative in this respect.[10] The prosecution noted in its closing argument, R. 380, that Mosley appeared to have been under the influence of drugs when she testified, and thus Griffin possibly could have provided more credible evidence as to Davis' alleged activities. Though Griffin would not have testified directly as to Davis' activities, her testimony concerning the altercation on the sidewalk would have lent support to Mosley's testimony.

Moreover, Griffin's testimony concerning the altercation might have also provided an alternative basis for explaining how Davis had become bruised. Since Griffin was not, unlike many of the defense witnesses, related to petitioners, her testimony would have been less subject to question on the basis of bias. Without Griffin, the defense

---

**10.** This conclusion is not a finding on an unmixed question of fact such that the *Sumner v.* *Mata* presumption of correctness applies.

432

was limited to arguing that some unknown person might have committed the assault. With Griffin, that theory would have been less speculative. Griffin's testimony would have provided a more solidly placed anchor for the defense's theory of the case. It was therefore important testimony.

Further, as we have noted, there is no evidence that petitioners willfully withheld Griffins' name from the court or the prosecution. There was no suggestion of prejudice by the prosecution, and nothing indicating that any great delay would have been occasioned had Griffin been permitted to testify. *See* p. 428 *supra*. Though the prosecution was surprised by the mention of Griffin, surprise in itself means nothing; surprise becomes meaningful only where it causes prejudice. There was no showing of prejudice here. Thus, even applying a balancing test, the trial court based its ruling on a showing by the state that was inadequate to overcome the presumption against exclusion of otherwise probative and admissible defense evidence. *See Washington v. Texas,* 388 U.S. at 19, 87 S.Ct. at 1923; *Fendler,* 717 F.2d at 1558. We hold that the state court committed constitutional error in precluding Griffin's testimony.[11]

■ We must next decide whether the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Alicea v. Gagnon,* 675 F.2d at 925. The test is "'whether there is a reasonable possibility' that the error affected the jury's verdict. In answering this question, the court must assess the 'probable impact of the [error] on the minds of an average jury.'" *Allison v. Gray,* 603 F.2d 633, 634 (7th Cir.1979) (quoting *Chapman,* 386 U.S.

at 24, 87 S.Ct. at 828, and *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969)). Based on the non-cumulative nature of the evidence and the fact that it would have provided a more solid basis for the defense theory of the case, *see* p. 431 *supra,* we cannot conclude beyond a reasonable doubt that the state trial court's error was harmless.

Respondent has not requested an evidentiary hearing, and we do not find one necessary.[12] All the evidence needed to rule on the due process and harmless error issues is contained in the trial record. Petitioners' motion for summary judgment is granted, and respondent's motion for summary judgment is denied. The petition for a writ of habeas corpus is granted. The writ will issue·unless petitioners, Jimmie Enoch, Melvin Enoch and Robert Enoch, are retried within 120 days hereof. Judgment to enter accordingly.

11. There are several cases upholding the preclusion of defense witnesses or other evidence under the federal notice of alibi rule, Fed.R. Crim.P. 12.1, as a sanction for noncompliance. *See, e.g., United States v. White,* 583 F.2d 899 (6th Cir.1978); *United States v. Fitts,* 576 F.2d 837 (10th Cir.1978); *United States v. Barron,* 575 F.2d 752 (9th Cir.1978); and *United States v. Myers,* 550 F.2d 1036 (5th Cir.1977) (preclusion of government witness), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). *Myers* involved a government witness, and in none of

the other three cases was the question presented in constitutional terms. *See White,* 583 F.2d at 901 n. 3; *Fitts,* 576 F.2d at 837, 839 (sixth amendment question presented, but in context of claim of ineffective assistance of counsel); *Barron,* 575 F.2d at 757 n. 5.

12. No argument is made that petitioners failed to preserve their constitutional claim at trial or on direct appeal.