THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN ENOCH *et al.*, Defendants-Appellants.

First District (6th Division) No. 1—86—0741

Opinion filed-September 29, 1989.

538

EGAN, P.J., specially concurring.

Randolph N. Stone, Public Defender, of Chicago (Thomas J. Brosnan and Alison Edwards, Assistant Public Defenders, of counsel), for appellants.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Kenneth T. McCurry, and Mark Shlifka, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINLAN delivered the opinion of the court:
Defendants Robert, Melvin and Jimmie Enoch were charged with the rape and aggravated kidnapping of Sandra Davis on December 6, 1979. The defendants were convicted of both counts following a jury trial before Judge Thomas Maloney in the circuit court of Cook County, held in 1980. This court affirmed the convictions (*People v. Enoch* (1982), 104 Ill. App. 3d 1203, 437 N.E.2d 944 (unpublished order under Supreme Court Rule 23)), and the Illinois Supreme Court

denied leave to appeal. Subsequently, the defendants petitioned the United States District Court for the Northern District of Illinois for a writ of *habeas corpus*. That court granted defendants' petition and ultimately ordered a new trial for the defendants. *United States ex rel. Enoch v. Lane* (N.D. Ill. 1984), 581 F. Supp. 423.

The United States District Court ruled that the trial court in the original trial had committed reversible error when it refused to allow a witness, Patricia Griffin, to testify for the defense. The trial court had refused to allow Griffin to testify as a discovery sanction since Griffin was not added to the defense witness list until after the State had rested its case, even though Griffin lived next door to the defendants at the time of the alleged rape, and defendants' mother had been aware of Griffin's potential testimony for some time, but simply had never informed defendants' attorney about that testimony. The district court held that the trial court's sanction amounted to reversible error because Griffin's testimony was crucial to the defense, and the State had failed to show any prejudice to it as a result of the late disclosure. (*Enoch*, 581 F. Supp. 423.) The district court's order was affirmed by the Seventh Circuit Court of Appeals. *United States ex rel. Enoch v. Hartigan* (7th Cir. 1985), 768 F.2d 161.[1]

Subsequently, defendants were retried in a jury trial again before Judge Maloney in 1986. At this trial, Robert and Melvin Enoch were again found guilty of rape and aggravated kidnapping, and Jimmie Enoch was found guilty of rape. The trial judge then sentenced Robert and Jimmie Enoch to 25 years' imprisonment, and Melvin Enoch to 12 years' imprisonment. Defendants now appeal their convictions to this court.

---

[1]We note that since the Seventh Circuit's decision reversing and remanding this case, the United States Supreme Court has held, also in a Cook County circuit court case, that it is not *ipso facto* reversible error for a trial court to preclude the testimony of a proposed defense witness as a discovery sanction for failing to disclose that witness before trial. (*Taylor v. Illinois* (1988), 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646.) There, the Court acknowledged that the accused has a fundamental right to present witnesses in his defense, but held that this right is not unfettered. (*Taylor*, 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646.) The *Taylor* court held that the trial court there properly excluded the testimony of a defense witness who was not added to the defense witness list until the State had rested its case, even though defense counsel had been aware of the witness for some time. (*Taylor*, 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646.) The Court stated that "[r]egardless of whether prejudice to the prosecution could have been avoided in this *** case, it is plain that the case fits into the category of willful misconduct in which the severest sanction [exclusion of the witness' testimony] is appropriate." *Taylor*, 484 U.S. at 417, 98 L. Ed. 2d at 815, 108 S. Ct. at 656.

The retrial of defendants in this case took place in January 1986. In defense counsel's opening statement, he told the jury that he would prove that the victim, Sandra Davis, was a prostitute and that she was working on the night when she was allegedly raped. Defense counsel also said he would show that Davis was beaten by her pimp on the morning of December 6, 1981, for not having the money she was supposed to have earned the night before. He further told the jury that Davis had fabricated her story about being raped in order to explain why she had been beaten. Following opening statements, testimony was heard in the case.

Sandra Davis, the victim, testified that she was 18 years old in December 1979 and on the evening of December 5, 1979, she took the CTA to her cousin's house around 8 p.m. to play cards. Davis said she stayed at her cousin's house until approximately 4 a.m. and then took the CTA home. On her way home from the CTA station, around 5 a.m., Davis walked past 2031 South Clark street in Chicago, a building adjacent to her apartment building at 2030 South Clark.[2] When she passed 2031 South Clark, she noticed Robert, also known as "Sunny," and Melvin Enoch. She said she knew Sunny and Melvin but was not friends with them.

Davis said that as she walked by, Sunny asked her if she had any cigarettes, and when she said no, he asked her if she thought she was too good to hang around with him. Sunny then grabbed her, showed her a gun, and told her that he and Melvin were going to rape her. Sunny and Melvin pushed her into an elevator and took her up to their apartment on the 14th floor. At this point, Davis testified, she began yelling and crying, so Sunny slapped her in the face. Once inside the Enochs' apartment, Sunny told Davis not to make any noise because his mother was asleep in the apartment. Sunny then hit Davis in the head with his gun.

Davis told the jury that she was taken into a back bedroom which contained two beds. Davis testified that Doug Enoch, Melvin and Sunny's brother, was in one of the beds. Sunny took Davis to the other bed and removed her clothes, as well as some of his clothing. He slapped her and pushed her onto the bed and then had intercourse with her. At this same time, Davis saw Melvin in the doorway taking pictures.

---

[2] We note that according to the numbering system for buildings in Chicago, 2030 and 2031 South Clark should not be adjacent buildings. We will refer to the adjacent buildings as 2030 and 2031, however, because this is how the parties referred to the buildings in the record and, also, the numbering of the buildings is not critical to this appeal.

After Sunny had finished having intercourse with her, Davis said, Melvin came into the room. When Davis tried to put her clothes back on, Melvin slapped, pushed and choked her and told her he was the devil. Melvin then had intercourse with her while Sunny stood in the doorway taking pictures.

Melvin then left the room and Jimmie Enoch, another brother, came in with a towel and wiped between Davis' legs. Jimmie then also had intercourse with Davis. Next, Sunny came back into the room and told Davis that he was not finished. Sunny had intercourse with Davis a second time and he told her that she now belonged to them. Sunny slapped Davis around and said if she told anyone what had happened, he would kill her, her mother and her sister, and would show everybody the pictures that he and Melvin had taken.

Davis said she was allowed to leave the Enochs' apartment around 7:25 a.m. When she arrived home, she went into her bedroom without telling her mother what had happened. Davis testified that around noon, she got up and her mother asked her what was wrong. Davis did not reply and her mother again asked her what was wrong. Davis then told her mother that Sunny, Melvin and Jimmie had raped her. Davis' mother immediately called the police. Thereafter, police officers came to the apartment and took Davis to Mercy Hospital.

On cross-examination, Davis admitted that she had said, in 1980, that the Enochs approached her at 2:30 a.m. Defense counsel also asked Davis if she had previously testified that she saw defendants' mother and sister asleep in the Enoch apartment, to which Davis replied "no." Davis admitted that she had previously testified that she saw a flash from the camera, but said that after she had collected her thoughts, she remembered that there was no flash. Davis conceded that her mother had asked her what was wrong at 7:30 a.m. on December 6, 1979, and admitted that she did not tell her mother about the rape at that time. On redirect, Davis explained that she said nothing to her mother at 7:30 a.m. about the rape because she was afraid of Sunny's threats.

Alma Davis, Sandra's mother, then testified that when Davis came home at 7:30 a.m. on December 6, 1979, she was crying and upset and her face was swollen and scratched. When Mrs. Davis asked her what was wrong, Davis did not reply and went into her room. Around noon, Mrs. Davis said, Davis came back out, so Mrs. Davis asked her why she was still upset and crying. Mrs. Davis insisted that Davis tell her what was wrong. Davis then told her mother that Sunny, Melvin and Jimmie Enoch had raped her, at which point Mrs. Davis called the police.

Dr. Patterson testified for the State that he was a specialist in obstetrics and gynecology and was practicing at Mercy Hospital in December 1979. While at Mercy Hospital, Patterson had examined 60 to 70 rape victims and, on December 6, 1979, he examined Davis. He noticed that the right side of her face was scratched and swollen. He also noticed a pool of fluid in her vagina, which upon examination under a microscope showed "numerous multi-sperm freely swimming," indicating intercourse within the last eight hours. Patterson said that throughout the examination, Davis was upset and crying. Patterson said that he remembered three things about this case: that Davis said she had been assaulted by three men, that Davis had been severely beaten around her face, and that Davis said her attackers had taken pictures during the sexual attack. On cross-examination, Patterson admitted that he did not know if, in fact, Davis had been assaulted by three men or if she had actually been raped.

The only witness that defendants presented in their defense was Patricia Griffin. Griffin testified that she was floor captain of the 14th floor in the building located at 2031 South Clark. She testified that the Enochs had lived next door to her in 1979 and that her bedroom shared a wall with the bedroom of the Enoch boys. Griffin said that on December 6, 1979, she got up for work at 6:30 a.m. and left her apartment around 7:15 a.m. Griffin testified that during the time that she was getting ready for work, she never heard any noise from the Enoch apartment.

Griffin also testified that she had known Davis since Davis was young. Griffin then said that as she was leaving her building to go to work on December 6, she saw Davis with a man Griffin did not know. The man was grabbing the front of Davis' blouse. As Griffin ran to catch her bus, she heard someone say, "bitch, where my mother fucking money at[?]" Following Griffin's testimony, the defense rested. As noted, defendants were found guilty and now appeal their convictions and sentences to this court.

Defendants first argue on appeal that the trial judge displayed a hostile attitude toward their witness, Griffin, and improperly acted as prosecutor in questioning her, thus depriving them of a fair trial. The first exchange objected to by defendants occurred when the trial judge questioned Griffin about how she knew the Enoch boys shared the bedroom which abutted the wall with her bedroom. Defendants allege that the trial judge's comments during that exchange revealed impatience and hostility toward Griffin, and also a disbelief in her testimony.

The State contends that the trial judge was not acting with impa-

tience or hostility when he questioned Griffin, but was merely trying to clarify her testimony. Additionally, the State claims that the trial judge was attempting to assist the defense in laying the foundation for Griffin's testimony.

The defendants, however, maintain that the trial judge completely abandoned his judicial role and improperly acted as prosecutor when he questioned Griffin as she was testifying about the man she saw grabbing Davis' blouse. Among the questions complained of by defendants were the following: "Now, you are [the] building captain, aren't you? *** Did you do anything about this when you saw the man [who allegedly was holding Davis by her blouse]—had you ever seen the man before? *** You didn't do anything about it, you kept running, right?" Defendants claim that this line of questioning by the trial judge discredited Griffin's testimony in the eyes of the jury. Consequently, defendants assert that they were deprived of their right to a fair trial and are entitled to a new trial.

The State, on the other hand, denies that this questioning was improper and contends that, here too, the trial judge was merely attempting to clarify Griffin's testimony. The State submits that the trial judge's questioning here did not deprive defendants of a fair trial because the trial record failed to show any bias or partiality on the part of the trial judge. Accordingly, the State says that the trial court acted properly within its judicial function when it questioned Griffin.

■■ ■ It is within a trial court's discretion to question witnesses in an attempt to elicit the truth or to clarify obscure matters, so long as the court remains fair and impartial in its questioning. (*People v. Gross* (1988), 166 Ill. App. 3d 413, 422, 519 N.E.2d 1043, 1050; *People v. White* (1973), 16 Ill. App. 3d 419, 425, 306 N.E.2d 660, 666.) A trial court has not improperly acted as a prosecutor if his questions were asked only to clarify the evidence. (*Gross*, 166 Ill. App. 3d at 422, 519 N.E.2d at 1050.) A trial court is also given wide discretion in conducting a trial, but the court cannot make comments or insinuations indicating its opinion on the credibility of a witness or the argument of counsel. (*People v. Cobbins* (1987), 162 Ill. App. 3d 1010, 1028, 516 N.E.2d 382, 395.) However, in order to constitute reversible error, the trial court's remarks must have been a material factor in the defendant's conviction or must appear to have prejudiced the defendant. *Cobbins*, 162 Ill. App. 3d at 1028, 516 N.E.2d at 395.

■ Defendants have cited numerous cases to support their claim that the trial judge here acted partially and with hostility, and improperly assumed the role of prosecutor. (See *People v. Sprinkle* (1963), 27 Ill. 2d 398, 189 N.E.2d 295; *People v. Santucci* (1962), 24 Ill. 2d 93,

180 N.E.2d 491; *People v. Marino* (1953), 414 Ill. 445, 111 N.E.2d 534; *People v. Pressley* (1987), 160 Ill. App. 3d 858, 513 N.E.2d 921; *People v. Martin* (1966), 66 Ill. App. 2d 290, 214 N.E.2d 324.) We find, however, that those cases cited by defendants are distinguishable from the present case. We do not believe that the trial judge here assumed the role of a prosecutor, and a review of the record supports the State's contention that the trial judge's questions were directed only toward clarifying Griffin's testimony. The trial court explained its actions at defendants' motion for a new trial. The court said that Griffin spoke very rapidly and tended to ramble and, therefore, it was necessary to periodically tell her to wait a minute so the jury could understand her. Further, to the extent that any error occurred here, we find it to be harmless error since the defendants' guilt was established beyond a reasonable doubt and there is no evidence that an error formed the basis for the jury's verdict; consequently, the error is harmless. *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1083, 502 N.E.2d 304, 310.

Defendants next claim that the trial court committed reversible error and denied them their right to a fair trial during defense counsel's closing argument. Defense counsel, during the closing argument, told the jury that the semen and bruises which Dr. Patterson testified about were "also consistent with the proposition that she [Davis] [was] working as a prostitute. That she [had] sex with somebody else that night. Maybe several people. And that she was beaten up by her pimp." The court then interrupted defense counsel and told the jury that they could not infer that the victim, Davis, was a prostitute. Defendants contend that the trial court, at this point, directly contradicted the holding of the Federal courts, which had said that the trial jury did, in fact, have a right to infer that Davis was a prostitute. In addition, the defendants claim that the trial judge compounded the error when he misstated the evidence, specifically, when the judge said that Griffin had testified that she only heard the unknown man say "bitch."

The State, on the other hand, asserts that there was no evidence at this trial to support the inference that Davis was a prostitute, and, accordingly, the trial judge properly ruled that the jury could not infer that she was. Also, the State maintains that the trial judge did not contradict the Federal courts' holding, but found that the ruling by the Federal courts was not binding on retrial because certain witnesses who testified at the first trial did not testify at this trial and, without the testimony of the other witnesses, any inference that Davis was a prostitute was no longer valid. Moreover, the State notes

that the Seventh Circuit affirmed the district court's order for a retrial to allow Griffin to testify and, in this retrial, Griffin did testify. Finally, the State argues that the trial court did not misstate the evidence concerning Griffin's testimony, but was merely confused, as he later explained.

In *United States ex rel. Enoch v. Lane* (N.D. Ill. 1984), 581 F. Supp. 423, the district court held that based on the proffered testimony of Griffin, a jury could have inferred that Davis was a prostitute. In defendants' first trial, however, defendants had presented six defense witnesses, including Teresa Mosley, who testified that she and Davis " 'use [sic] to have sex with mens [sic] for money.' " (*Lane*, 581 F. Supp. at 426.) The district court said, "Griffin's testimony would have buttressed petitioners' contention that Davis was a prostitute by providing evidence corroborating Teresa Mosley's testimony," and that even though "Griffin would not have testified directly as to Davis' activities, her testimony *** would have lent support to Mosley's testimony." (*Lane*, 581 F. Supp. at 431.) Likewise, the Seventh Circuit noted that Griffin's testimony "was highly significant when considered in light of the other evidence in the case." *United States ex rel. Enoch v. Hartigan* (7th Cir. 1985), 768 F.2d 161, 163.

██ Although statements and arguments based upon facts in evidence or reasonable inferences therefrom are within the scope of a proper closing argument (*People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746, 750), we find no error in the trial court's ruling that the jury could not infer that Davis was a prostitute based on Griffin's testimony alone. As the State noted, the district court merely held Griffin's proffered testimony in the prior trial would have been sufficient to support an inference of prostitution in conjunction with the testimony of Teresa Mosley. Here, the only evidence arguably relevant to the allegation of prostitution was Griffin's testimony that she heard someone say, "bitch, where my mother fucking money at[?]" This statement, on its own, we believe, was insufficient to support defendants' claim that Davis was a prostitute. Furthermore, we note that the defense did actually tell the jury during his closing argument, before the trial judge stopped him, that Davis was a prostitute and had been beaten by her pimp on the night of the alleged rape. Hence, any alleged error in the trial court's ruling was harmless under the circumstances.

██ We also find that the trial judge did not prejudice the defendants when he misstated Griffin's testimony. The trial judge promptly corrected himself after a juror confirmed that Griffin had said she heard the unknown man say, "bitch, where my mother fucking money

at[?]" which clearly indicates that the jury heard and remembered Griffin's testimony. We further do not find that the trial judge improperly commented on the credibility of a witness or the argument of counsel when he misstated Griffin's testimony. (See *Cobbins*, 162 Ill. App. 3d at 1028, 516 N.E.2d at 395.) The court again explained at defendants' hearing on their motion for a new trial that Griffin would begin her testimony loudly and then immediately drop her voice. Because Griffin was turned away from the judge and was facing the jury, the court said that the problem occurred simply because he did not hear what Griffin said after "bitch."

Next, defendants assert that the trial judge's comments during their sentencing hearing revealed his resentment of the fact that the Federal courts had ordered a retrial, which the defendants claim somehow deprived them of a fair trial. It is the defendants' position that the trial judge by his comments revealed his desire to achieve the same verdict upon retrial that the jury had reached in defendants' first trial, and that he therefore had achieved this result in some undescribed prejudicial manner. Defendants, consequently, ask this court to grant a retrial before a different judge.

The State responds that the trial judge's remarks at the post-trial hearing could not have deprived the defendants of a fair trial since the defendants were convicted by a jury. In addition, the State alleges that the judge's comments revealed only that he disagreed with the Federal courts' resolution of the matter, not that he resented the retrial order or intended that the same result would be achieved in the second trial.

■ A defendant must make a claim of prejudice at the earliest moment after any prejudice is discovered. (*People v. Taylor* (1984), 101 Ill. 2d 508, 518, 463 N.E.2d 705, 710.) However, merely because a trial judge has ruled against a defendant in a prior case is not in itself sufficient reason to disqualify that judge. (*Taylor*, 101 Ill. 2d at 518, 463 N.E.2d at 711.) In addition, the sentencing phase of a trial is committed to the sound discretion of the trial judge, and a reviewing court will not substitute its judgment for that of the trial court, absent an abuse of discretion. *People v. Alexander* (1984), 127 Ill. App. 3d 1007, 1018, 470 N.E.2d 1071, 1080.

■ We conclude that defendants were not prejudiced by the trial court's remarks at sentencing. First, defendants did not even raise the issue of prejudice until they filed their post-trial motion, despite their claim that the court's prejudice was apparent throughout the trial. Second, any possible prejudice here would go to the sentencing phase of the trial, not to the trial itself, and defendants do not com-

plain to this court about their sentences. Therefore, we find these allegations of prejudice to be without merit.

Defendants' next issue on appeal is that they were deprived of a fair trial due to numerous instances of prosecutorial misconduct in the State's closing and rebuttal arguments. First, defendants object to comments made during the State's rebuttal closing argument which, defendants argue, were made solely to arouse sympathy for the victim and to prejudice the jurors against defense counsel. These comments were: that rape victims hesitate to report their crime because they are not only humiliated and degraded, but when they go to court, they are called prostitutes; that defendants will claim consent as a defense if the victim has no injuries and fall back on prostitution as a defense if there are injuries; that defense counsel here never gave Davis a chance to say anything in response to his claim that she was a prostitute because he never asked her during cross-examination whether she was in fact a prostitute; that Davis came to court to tell 14 strangers about the most degrading and humiliating experience of her life and defense counsel then tried to "dirty up the victim"; and that if two mistakes in Davis' recollection of her 2½-hour ordeal constituted reasonable doubt, then we should pray that no one else is raped "because you are not only going to have to survive the rape, but you are also going to have to remember every single [detail of the rape]."

The State responds that defendants' objections to some of these comments were waived. Further, the State contends that the prosecutor's comments were proper or were invited by defense counsel. For example, the State asserts that its comment concerning the hesitation of rape victims to report the crime was in response to defense counsel's claim that Davis hesitated so that she could make up a story. The comment that rape victims are called prostitutes was in response to defense counsel's attempts to characterize Davis as a prostitute. The comment concerning the defenses of consent and prostitution was in response to defenses raised at trial and did not imply that defense counsel was fabricating its defense. Also, the State maintains that its comment concerning defense counsel's failure to ask Davis whether she was a prostitute was a comment on defense counsel's failure to prove what he said he would prove in his opening statement, *i.e.*, that Davis was a prostitute and had lied about being raped. Responding to the comment that defense counsel was trying to "dirty up" the victim, the State says that this was in response to defense counsel's claim that Davis had fabricated her story. Finally, the State contends that the comment to "pray no one else is raped" was proper and

merely a comment on the evils of crime.

A prosecutor is given great latitude in making his closing statement and the trial court's ruling on the propriety of that argument will not be reversed unless that court has abused its discretion. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175, 514 N.E.2d 970, 976.) In order to constitute reversible error, the allegedly improper remarks must have substantially prejudiced the accused. (*Cisewski*, 118 Ill. 2d at 175, 514 N.E.2d at 976.) Additionally, when a defendant alleges instances of prosecutorial misconduct, a reviewing court will examine the closing arguments of both the State and the defendant in their entirety and will place the objected-to comments in their proper context. *Cisewski*, 118 Ill. 2d at 175-76, 514 N.E.2d at 976.

Upon examining the closing arguments of both the State and the defendant here, we agree that many of the State's comments were invited by the defendant. A defendant should not be allowed to benefit from his own counsel's misconduct which invited the State's response. (*People v. Trass* (1985), 136 Ill. App. 3d 455, 467, 483 N.E.2d 567, 576.) Some of defense counsel's remarks in closing were as follows: "just because somebody says something, *** that doesn't make it so"; "what we have in this case is a young woman who tells an implausible story"; "[concerning the discrepancies in Davis' testimony from 1980] she has had six years to think about this. She knew that she had told two different stories on this point *** and now she has to try and explain it away"; "she [Davis] makes up a story, and she gets committed to this story"; that there was "an enormous reasonable doubt that Doug Enoch could sleep through this horrendous event, she has told you about"; "you draw the inference [that Davis was a prostitute] from what that man said to Sandra Davis." Placing the objected-to comments in their proper context, then, we find that the State's comments were within the bounds of a proper closing argument.

The next allegedly improper comment also occurred during the State's rebuttal closing argument. Defendants allege that the State improperly commented on their failure to testify when the prosecutor said, "So, let's look at what evidence was there. Certainly, the victim testified, she got on that stand. She testified. And you have heard, she testified before. And she was cross-examined by counsel." This error was compounded, defendants argue, when the prosecutor also told the jury that the evidence in the case was uncontroverted and uncontradicted, even though Griffin had testified that she heard nothing from the Enoch apartment at the time of the alleged rape.

The State claims that the prosecutor's comments here were not

intended to draw the jury's attention to defendants' failure to testify, but were only comments on the strength of the circumstantial evidence against the defendants. The State also maintains that Davis' testimony was in fact uncontradicted because Griffin, defendants' sole witness, only testified that she heard nothing in the Enoch apartment, not that the rape never occurred.

A defendant's right to remain silent is violated by a prosecutor's remark if the remark was intended, directly or indirectly, to focus the jury's attention on defendant's silence. (*People v. Morgan* (1986), 112 Ill. 2d 111, 133, 492 N.E.2d 1303, 1312; *People v. Edwards* (1979), 77 Ill. App. 3d 237, 242-43, 395 N.E.2d 1095, 1099.) In *Morgan*, the Illinois Supreme Court held that it was not objectionable for the prosecutor to say, "Don't you think that somebody has some explaining to do?" and to note that the defendant in that case "had his opportunity to confront the witnesses against him and bring his evidence forward." *Morgan*, 112 Ill. 2d at 133, 492 N.E.2d at 1311.

We cannot say that the prosecutor's remark here was intended or calculated to draw the jury's attention to the defendants' failure to testify. Upon examining the record, we find it reasonable to conclude that the prosecutor was not trying to draw the jury's attention to the defendants, but to the fact that if Davis was a prostitute, the jury would have heard about it. The defendants note that the prosecutor told the jury that they had heard Davis testify on both direct and cross-examination, but defendants fail to mention that the prosecutor then told the jury that if Davis was a prostitute, that fact certainly would have been brought out during her testimony. Accordingly, taken in context, this comment was not a comment on defendants' failure to testify and, hence, was not erroneous.

Further, a prosecutor's comment on the uncontradicted nature of testimony, in his summary of the evidence, does not amount to a comment upon the defendant's failure to testify. (*People v. Rodriquez* (1983), 121 Ill. App. 3d 50, 59, 459 N.E.2d 254, 260.) We find that the prosecutor's comment that Davis' testimony was uncontradicted was a proper comment on the evidence and was not a comment on defendants' failure to testify. Moreover, as the State argued, Griffin did not contradict Davis' testimony that she was raped, but only said that she did not hear any noise from the Enoch apartment.

Defendants next object that the prosecutor improperly commented on their failure to call their mother and their brother Doug to testify as witnesses. Defendants claim that this comment was improper because their mother and Doug were equally accessible to the State, and the State cannot comment on a defendant's failure to call a

witness that is equally accessible to it. Defendants also note that the State can properly comment on a defendant's failure to call an alibi witness, but claim that neither Doug nor their mother was an alibi witness.

The State denies that it was commenting on defendants' failure to call certain witnesses. The State claims that its comment was based on the evidence, because Davis had testified that Doug Enoch was present in the room where she was raped and that defendants told her that Mrs. Enoch was home. In addition, the State contends that its comments were in response to defense counsel's closing, where he suggested that Davis made up her story, especially her claim that Doug remained asleep throughout her ordeal.

The State cannot comment on a defendant's failure to call a non-alibi witness to testify when the comment implies that the witness' testimony would have been unfavorable to the defendant, and when that witness is equally accessible to the State. (*People v. Lasley* (1987), 158 Ill. App. 3d 614, 632, 511 N.E.2d 661, 674.) A witness, however, is not equally available if he is likely to be biased against the State, for example, if that witness is related to the defendant. (See *People v. Morando* (1988), 169 Ill. App. 3d 716, 735, 523 N.E.2d 1061, 1075; *People v. Wilson* (1986), 149 Ill. App. 3d 293, 300, 500 N.E.2d 128, 133; *People v. Taylor* (1985), 137 Ill. App. 3d 148, 154, 484 N.E.2d 383, 387.) Hence, we conclude that any comment by the prosecutor on defendants' failure to call their mother and brother to testify here was proper inasmuch as defendants' mother and brother were not equally accessible to the State, because they were likely biased against the State and also may have contradicted the victim's testimony.

Defendants also argue that they were denied a fair trial because the prosecutor misstated the medical evidence. The prosecutor had argued, in his closing, that Dr. Patterson's testimony corroborated Davis' testimony that she was raped by three men. The State then said that Dr. Patterson testified that there was a large pool of semen inside Davis' vagina and that he was very interested in the amount of semen, but, the defendants assert, Dr. Patterson had never testified concerning the quantity of semen. Finally, the defendants object to the prosecutor's admonishment to the jury to use their common sense to decide whether Dr. Patterson, who had examined 60 to 70 rape victims, thought Davis was just some prostitute.

The State first responds that this issue was waived by defendants. If not waived, the State contends that this comment about the quantity of the semen did not amount to reversible error because it was an

overstatement rather than a misstatement. Concerning the admonishment to the jury to use their common sense, the State says that this was a proper and an appropriate inference based on Dr. Patterson's testimony and also was invited by defense counsel's repeated attempts to show that Davis was a prostitute.

It is not reversible error when a prosecutor overstates evidence that is partially corroborated, as opposed to actually misstated. (*Cobbins*, 162 Ill. App. 3d at 1022, 516 N.E.2d at 391.) Here, Dr. Patterson testified that the right side of Davis' face was swollen, that he noticed a pool of fluid in her vagina, that intercourse had taken place within the last eight hours, and that Davis was emotionally upset and said that she had been raped by three men. Hence, we believe that the prosecutor here merely overstated the evidence, and this overstatement did not amount to reversible error.

Next, the defendants argue that the prosecutor committed reversible error when he misstated Davis' testimony. The comments objected to here also occurred during the State's rebuttal closing argument, when the prosecutor told the jury that Davis had said, on the stand in this trial, that she had

> "testified at a preliminary hearing in 1980, took that witness stand. And in another court, sworn under oath to tell the truth. And, once again, said those three Defendants, they raped me. Looked them in the face and said, they raped me."

Defendants argue that although Davis was impeached with her testimony from the preliminary hearing and the first trial, Davis never affirmatively made the above statement in the present trial. This error was especially prejudicial, according to defendants, because it implied a prior consistent statement with her assertion that the defendants had raped her.

The State admits that this comment was erroneous, but maintains that any error was cured when the trial court instructed the jury to disregard the comment. Further, the State argues that a prior consistent statement, although generally not admissible, is admissible to rebut a charge of fabrication.

We agree that this remark was erroneous. However, we cannot say that the remark rose to the level of reversible error, given the other proper evidence of defendants' guilt. See *Cisewski*, 118 Ill. 2d at 175, 514 N.E.2d at 976.

In addition to the foregoing allegedly objectionable comments, defendants also complain on appeal that the prosecutor improperly aroused the fears and emotions of the jury by referring to rape, in both his opening and closing argument, as every woman's nightmare.

Defendants also claim that the prosecutor improperly tried to align himself personally with the jurors, when he said, "I don't ask you to find the verdict of guilty based on just Sandra Davis, but for each and every one of us, and all of our loved ones."

The State argues that defendants waived this issue on appeal. If not waived, the State claims that this was a proper comment on the evils of rape. Moreover, the prosecutor's use of the word "our," according to the State, was not improper because the State did not put itself in the position of the "thirteenth juror" or comment on the veracity of witnesses.

 A prosecutor may properly decry the evils of crime and its impact on the victims. (*People v. Carter* (1985), 132 Ill. App. 3d 523, 530, 477 N.E.2d 1307, 1311.) We hold, as the State has argued, that the comment that rape is "every woman's nightmare" was an acceptable comment on the evils of rape and its impact on the victims and, therefore, was not erroneous.

Addressing defendants' claim that the prosecutor improperly tried to align himself with the jurors, it is true that although a prosecutor is given great latitude in his closing argument, he may not invade the province of the jury or act as a "thirteenth juror." (See *People v. Martin* (1975), 29 Ill. App. 3d 825, 830, 331 N.E.2d 311, 314-15; *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 681, 291 N.E.2d 5, 7.) Here, we do not believe that the prosecutor, referring to "each and every one of us, and all our loved ones," improperly invaded the province of the jury or acted as a thirteenth juror. Thus, we find that the prosecutor was within the bounds of a proper closing argument when he made the foregoing comments.

Finally, defendants claim reversible error occurred when the State said, in closing argument, that reasonable doubt is used in every criminal case and "[t]here is nothing magical" about it. Also, defendants argue that the State implied that defendants had a burden of proof when it said, "So, lets look at what evidence was there. Certainly, the victim testified, she got on that stand. She testified," and when the prosecutor said if there was evidence that Davis was a prostitute, the defense would have introduced it. The comment that if Davis was a prostitute, the jury would have heard about it, was also objectionable, defendants say, because it violated the Illinois rape shield statute.

The State maintains that these comments were within the proper bounds of closing argument and were legitimate inferences based on the testimony. Concerning defendants' allegations about the rape shield statute, the State contends that under the unique circumstances of this case, the remarks were a proper response to defense

counsel's repeated allegations that Davis was a prostitute.

This court has held that a prosecutor is within the bounds of proper closing argument if he tells a jury that there is nothing mystical or magical about reasonable doubt, but that it is a burden addressed by juries every day. (See *Trass*, 136 Ill. App. 3d at 467, 483 N.E.2d at 576.) Therefore, it was not erroneous for the prosecutor here to tell the jury that "there is nothing magical" about reasonable doubt. We also find that the other comments objected to by defendants were invited by defense counsel (see *Trass*, 136 Ill. App. 3d at 467, 483 N.E.2d at 576) or, if error, were harmless error because the defendants' guilt was more than sufficiently established by the evidence.

The fourth issue that defendants raise on appeal is that the trial court erroneously allowed Davis' mother and Dr. Patterson to testify about their conversations with Davis, which, defendants argue, were hearsay statements that did not qualify as spontaneous declarations or corroborative complaints. Defendants say that Davis' statement to her mother was not spontaneous because it was made 4½ hours after the alleged rape occurred and was the result of her mother's questioning. The statements also do not fit within the corroborative complaint exception, defendants argue, because Davis' mother and Dr. Patterson were allowed to testify concerning the details of the rape. This error was highly prejudicial, then, because it bolstered Davis' credibility.

The State responds that Davis' statements were properly admitted to rebut defense counsel's claim that Davis was lying, and also were properly admitted under the spontaneous declaration and prompt complaint exceptions. Despite the 4½-hour gap, the State argues that Davis' statement was spontaneous, given the nature of the attack and the threats made by defendants, as well as the fact that Davis was still emotionally upset when she did report the rape to her mother. Finally, the State contends that any error here was harmless since the testimony was cumulative of Davis' testimony and the witnesses were available for cross-examination by the defense.

In order for testimony to be held admissible as a spontaneous declaration, three factors must be present. (*People v. Robinson* (1978), 73 Ill. 2d 192, 199, 383 N.E.2d 164, 168.) The occurrence must be sufficiently startling to cause a spontaneous and unreflecting statement, there must be an absence of time in which to fabricate, and the statement must relate to the circumstances of the occurrence. (*Robinson*, 73 Ill. 2d at 199, 383 N.E.2d at 168.) None of these factors, however, is determinative, and the admissibility of a spontaneous declaration will be determined on a case-by-case basis, considering all

relevant facts. (*People v. Jarvis* (1987), 158 Ill. App. 3d 415, 422, 511 N.E.2d 813, 817.) The length of time between the startling occurrence and the statement is not as significant as the existence or lack of spontaneity.[3] (*Jarvis*, 158 Ill. App. 3d at 422, 511 N.E.2d at 817.) Further, the fact that a spontaneous declaration is made in response to a question will not destroy the spontaneity. *Jarvis*, 158 Ill. App. 3d at 422, 511 N.E.2d at 817.

■ We hold that Davis' complaint to her mother qualified as a spontaneous declaration. Although there was a 4½-hour time lapse, during which Davis slept, between the rape and her statement to her mother, we do not find this time lapse significant considering the nature of the attack and the threats made by the Enochs. When Davis told her mother about the rape, she was still very upset and crying. We think it highly unlikely, considering Davis' emotional state, that Davis fabricated her story during that 4½-hour period, as noted above, particularly in light of the fact that she was asleep during this time. We also hold that this spontaneity was not destroyed when Mrs. Davis asked Sandra what was wrong.[4]

■ We do not agree with the State that Davis' statement to Dr.

---

[3]Lapse of time is merely one factor that a court considers in determining whether the statement is the result of spontaneous excitement. Illinois courts have found such spontaneity to exist even some time after the initial, exciting event. A gunshot victim, locked in a car trunk for nearly 6½ hours, was held to have made a spontaneous declaration of "who did [it]" when the police opened the trunk. (*People v. Gacho* (1988), 122 Ill. 2d 221, 240-42, 522 N.E.2d 1146, 1155-56.) A four-year-old was found to have made a spontaneous statement when he was found lying in some bushes 18 hours after his father had been shot. (*People v. Chatman* (1982), 110 Ill. App. 3d 19, 26, 441 N.E.2d 1292, 1298.) In *People v. Watson* (1982), 107 Ill. App. 3d 691, 438 N.E.2d 453, a young victim's rape statement, made two hours after the incident where she had been asleep for an hour, was admitted. Also, in *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310, the court admitted a victim's statement as a spontaneous declaration, where the victim was questioned by a police officer at least one hour after he was discovered and an unknown time after the shooting. The court there extensively discussed the concept of spontaneous declarations, observing that it was a relative term which varied under each set of circumstances, case by case. The court further noted that the modern tendency was to extend and not limit the application of the doctrine and that several Federal and State cases had permitted admission of statements made 2 hours, 3 hours, 11 hours, and 14 hours after the occurrences.

[4]In *United States v. Iron Shell* (8th Cir. 1980), 633 F.2d 77, discussed in more detail *infra*, the court admitted as a spontaneous declaration the statement of the rape victim made between 45 minutes to 1 hour and 15 minutes after the assault, which was made in response to an inquiry of a police officer of "what happened." The court there stated:

"The lapse of time between the startling event and the out-of-court state-

Patterson qualified as a spontaneous declaration or as a corroborative complaint. However, we believe that Davis' statements to Dr. Patterson were admissible as statements made for purposes for medical diagnosis or treatment. This exception to the rule proscribing hearsay allows the admission of such statements, including those of pain, subjective symptoms, medical history, and physical demonstrations capable of simulation if made to an examining physician for purposes of medical diagnosis and treatment. (*People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564; see E. Cleary & M. Graham, Handbook of Illinois Evidence §803.8, at 560-63 (4th ed. 1984).) In *United States v. Iron Shell* (8th Cir. 1980), 633 F.2d 77, the court permitted the admission of an examining physician's testimony concerning statements of a rape victim made in response to questions posed by the physician. In those statements, she told the doctor, "she had been drug [*sic*] into the bushes, that her clothes, jeans and underwear, were removed and that the man had tried to force something into her vagina which hurt [and that] *** she tried to scream but was unable because the man put his hand over her mouth and neck." (*Iron Shell*, 633 F.2d at 82.) The doctor also testified that his examination revealed that there was a small amount of sand and grass in the perineal area but not in the vagina. (*Iron Shell*, 633 F.2d at 82.) He also said he found specific abrasions on both sides of the victim's neck and that this was consistent with someone grabbing the victim in the manner she described; however, he also stated he could not absolutely determine that they were so caused. (*Iron Shell*, 633 F.2d at 82.) We believe the Eighth Circuit in *Iron Shell* held that the statements there were reasonably pertinent to diagnosis and treatment, inasmuch as they were primarily concerned with what had happened rather than who had assaulted her. The testimony in *Iron Shell* is similar to Dr. Patterson's testimony here. Here, Davis' statements to Dr. Patterson were all re-

ment although relevant is not dispositive in the application of [the] rule. [Citations.] Nor is it controlling that Lucy's statement was made in response to an inquiry. [Citations.] Rather, these are factors which the trial court must weigh in determining whether the offered testimony is within the [spontaneous declaration] exception. Other factors to consider include the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements. In order to find that [the spontaneous declaration exception] applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation. [Citations.]" (*Iron Shell*, 633 F.2d at 85-86.)

Surely here, under the circumstances presented, the admission of the declarant's statement as a spontaneous declaration was not also an abuse of discretion.

lated to her physical condition and the rape, and not who raped her. Thus, the statements were consistent with promoting medical treatment and, consequently, the court did not err in admitting Dr. Patterson's testimony concerning Davis' statements to him.

Nevertheless, even if we were to find that these statements amounted to an erroneous admission of hearsay testimony, the error would not amount to reversible error. In *Robinson*, the supreme court held that the erroneous admission of hearsay testimony, which did not qualify as a spontaneous declaration or a corroborative complaint, was not reversible error where the testimony was merely cumulative of the rape victim's testimony and where defense counsel was able to cross-examine the hearsay declarant—the rape victim. (*Robinson*, 73 Ill. 2d at 200, 383 N.E.2d at 169.) The *Robinson* court said:

"Aside from the unsworn and sometimes cumulative nature of hearsay evidence, its most objectionable feature, and the main rationale underlying its exclusion, is the opposing party's inability to test the real value of the testimony by exposing the source of the assertion to cross-examination." (*Robinson*, 73 Ill. 2d at 200, 383 N.E.2d at 169.)

Here, the alleged hearsay testimony recited by Dr. Patterson was cumulative of Davis' testimony, and defense counsel was able to cross-examine the hearsay declarant, Davis, herself. Hence, in any event, there was no reversible error here. See *People v. Gant* (1974), 58 Ill. 2d 178, 186, 317 N.E.2d 564, 569.

The last issue defendants raise on appeal is that the trial court committed reversible error when it failed to ask prospective jurors two of three questions it had requested the court to ask during *voir dire*. The trial court agreed to ask each individual juror the second question submitted by the defendants, but refused to ask the first and third questions.[5] The trial court, however, did instruct the prospective jurors that the defendants are presumed innocent, that the State is required to prove the charges beyond a reasonable doubt, that defend-

---

[5]The defendants had requested the trial court to ask each individual juror the following questions:

"1. If at the close of all the evidence and after you have heard arguments of counsel you believe that the State has failed to prove the defendants guilty beyond a reasonable doubt, would you have any hesitation whatsoever in returning a verdict of not guilty?

2. If the defendants decide not to testify in their own behalf, would you hold it against them?

3. Do you understand that the defendants are presumed innocent and do not have to offer any evidence in their own behalf, but must be proven guilty beyond a reasonable doubt by the State?"

ants were not required to prove their innocence, that the jury was required to accept the law as stated in the instructions, and that the jury must find the defendants guilty if convinced of their guilt beyond a reasonable doubt, and not guilty if not so convinced. The trial court also did not question each prospective juror concerning his or her ability to follow these rules of law. Defendants claim error occurred because the trial court merely informed the jury of the law, without interrogating the individual jurors.

The State contends that these areas were adequately covered by the trial court's admonishments to the prospective jurors. The trial court's remarks here were sufficient, the State further argues, because the Illinois Supreme Court has said that the questions need not be asked in the precise form submitted.

In *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062, our supreme court held that it is essential in a criminal case that jurors know that a defendant is presumed innocent, that he is not required to present evidence, that the State must prove the defendant guilty beyond a reasonable doubt, and that a defendant's failure to testify cannot be held against him. The *Zehr* court held that the trial court in that case committed reversible error when it refused to ask the jury venire three questions submitted by the defense counsel exploring those issues. The *Zehr* court held, however, that the questions need not be asked in precisely the form submitted so long as the subject matter of the questions was covered during the course of the interrogation on *voir dire*. (*Zehr*, 103 Ill. 2d at 477, 469 N.E.2d at 1064.) Since *Zehr* was decided, the supreme court has also held that a trial judge need not actually question the individual jurors, finding *Zehr* satisfied by a "trial [court's] general admonition [to the jury venire] coupled with his subsequent discussion of the presumption of innocence." *People v. Emerson* (1987), 122 Ill. 2d 411, 427, 522 N.E.2d 1109, 1114.

Based on the foregoing, it is clear that no error occurred during the *voir dire* of the prospective jurors for defendants' trial. The trial judge did not interrogate each juror on all three of the *Zehr* questions submitted by defendants; however, his admonishment to the jury covered the subject matter contained within the *Zehr* questions. Under *Emerson*, then, the trial court's actions were sufficient.

Accordingly, for all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. Furthermore, pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, and *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, we grant the State's request that the defendants be assessed $75 as costs for the

State's defending this appeal, and incorporate it as part of our judgment.

Judgment affirmed.

LaPORTA, J., concurs.

PRESIDING JUSTICE EGAN, specially concurring:

I agree with the judgment affirming the conviction and all that is said in the opinion save in one respect. I do not agree that the statement of Sandra Davis made to her mother, in which she inculpated the defendants, was admissible as a spontaneous declaration exception to the hearsay rule.

Her mother saw her at 7:30 a.m. and noticed that she was crying and upset and that her face was swollen and scratched. When her mother asked what was wrong, Sandra did not answer and went to bed. Four and one-half hours later Sandra came out of her room, still upset and crying. Her mother again asked her what was wrong, and again Sandra did not answer. Her mother saw that she "didn't want to talk" but her mother "insisted" that Sandra tell her what happened. It was only then that Sandra told her mother that the defendants had raped her. In my judgment, that evidence fails to establish the spontaneity required under the rule.

I am aware that cases have held that lapse of time itself is not determinative, and some have held that the fact alone that the statement was made in response to a question does not render the evidence inadmissible. But I do not believe the cases cited by the majority support its holding. The *Chatman* case involved a statement by a four-year-old boy to the first person he encountered. In *Gacho* the statement was made in response to a question, but the victim had suffered multiple gunshot wounds and was discovered in a trunk by the police. In both *Chatman* and *Gacho* the statements were made at the first opportunity the victim had to speak. The *Watson* case involved a statement by a three-year-old child in a hospital emergency room.

In *Parisie*, the decedent was lying along a road with his shirt covered with blood. When the police arrived the decedent, in response to a question, said that he had been shot, that he did not know who shot him, that the man pulled out a gun and asked him for his wallet and that he did not know where his car was. Another conversation took place between the police and the decedent about two hours later at the hospital, where the decedent again told the police that he did not know who shot him, that he had met the fellow at 5th and Jefferson

Streets in Springfield, that they went for a ride around the lake and that they had not parked. This court said that the first statement was admissible as an exception to the rule but, significantly, not the second. The court held that the admission of the second statement was error, but not reversible.

Similarly, in *Robinson*, also referred to in the majority opinion, the court held that admission of statements made to the victim's sister under circumstances more favorable to the State than in this case "would do utter violence to the rule." (*Robinson*, 73 Ill. 2d at 199.) However, the court held that it was not reversible error. I view the evidence the same way as the appellate court did in *Parisie* and the supreme court in *Robinson*. To accept this evidence as an exception to the rule "would do utter violence to the rule" in my judgment. But I do not believe the admission of the evidence was prejudicial to the defendants. If anything, the evidence militated in favor of the defendants as evidenced by the use to which it was put in the defendants' closing argument. It is reasonable to assume that the defendants themselves would have brought out the fact that Sandra had been questioned by her mother and had refused to answer questions. The State in turn would have been entitled to show that Sandra at first said nothing because of her fear of the defendants. (See *People v. Weisberg* (1947), 396 Ill. 412, 430, 71 N.E.2d 671, 681.) In short, it seems clear that all of this evidence would have been heard anyway; but not as a spontaneous declaration.